# Exhibit 1

**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    ANTHONY RAPP and C.D.,        )
                                   )
5              Plaintiffs,         )
                                   )
6         vs.                      )  No. 20-cv-9586 (LAK)
                                   )
7    KEVIN SPACEY FOWLER a/k/a     )
     KEVIN SPACEY,                 )
8                                  )
               Defendant.          )
9    _____)

10

11

12

13

14              VOLUME I

15    VIDEO-RECORDED DEPOSITION OF ADAM VARY

16              December 16, 2021

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700.
     478552
25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

09:07 1          Q.  Have you review -- excuse me.

09:07 2              Have you reviewed any expert reports in this

09:07 3    case?

09:07 4          A.  No.

09:07 5          Q.  Have you ever communicated with Mr. Rapp's

09:07 6    attorneys in this case?

09:07 7          A.  Communicated, yes.

09:07 8          Q.  When did you communicate with them?

09:07 9          A.  Mr. Saghir called me at the beginning of the

09:07 10   year to inform me that Anthony Rapp was turning over

09:07 11   text messages in -- that he'd exchanged with me.  And --

09:07 12   and then when I was subpoenaed by Mr. Fowler, Peter

09:08 13   Saghir called me again to ensure that I had received the

09:08 14   subpoena.

09:08 15         Q.  So is it -- is it correct that you've only

09:08 16   spoken with Anthony Rapp's attorneys on two occasions?

09:08 17         A.  Three.  There two were two calls regarding the

09:08 18   text messages at the beginning of the year.

09:08 19         Q.  So let's talk about the first call you had with

09:08 20   Mr. Saghir.

09:08 21             Can you -- can you tell me how that went down.

09:08 22         A.  All I can really remember is that he told me

09:08 23   that there were going to be text messages turned over,

09:08 24   and he wanted me to know.  And I said that I would be

09:08 25   informing my previous employer, BuzzFeed, of that, which

                                    12

BARKLEY
Court Reporters

09:08  1    I did.

09:08  2        Q.  Did he discuss the substance of your

09:08  3    communications with Mr. Rapp on that first call?

09:08  4        A.  No.  Only -- to my memory, no.  All I --

09:09  5        Q.  Do you -- sorry.  Go ahead.

09:09  6        A.  All I remember is being informed that they were

09:09  7    being turned over.

09:09  8        Q.  How long do you believe the phone call was with

09:09  9    Mr. Saghir -- that first phone call?

09:09  10       A.  Fifteen minutes, to my memory.

09:09  11       Q.  Did you discuss the substance of Mr. Rapp's

09:09  12   allegations on that call?

09:09  13       A.  (No audible response.)

09:09  14           DEPOSITION OFFICER:  What was that?

09:09  15           THE WITNESS:  No.  No.

09:09  16   BY MR. SCOLNICK:

09:09  17       Q.  Did you -- did you discuss anything else on

09:09  18   that call?

09:09  19       A.  Not to my memory, no.

09:09  20       Q.  Did you discuss any potential witnesses for

09:09  21   Mr. Rapp on that call?

09:09  22       A.  No.  No.

09:09  23       Q.  Have you told me everything you remember about

09:09  24   that first call?

09:09  25       A.  Yes.

13

ADAM VARY - VOLUME I

BARKLEY
Court Reporters

09:09  1      Q.  Did Mr. Saghir send you a copy of the text

09:09  2  messages that he would produce?

09:09  3      A.  No.

09:10  4      Q.  Did you exchange e-mails with Mr. Saghir at or

09:10  5  around that first communication?

09:10  6      A.  No.

09:10  7      Q.  Okay.  So we've covered the first call.  Let's

09:10  8  talk about the second one.

09:10  9          Can you tell me about the second call.

09:10 10      A.  Second call was essentially a follow-up to let

09:10 11  Mr. Saghir know that I had informed BuzzFeed and that

09:10 12  somebody from BuzzFeed would probably be in touch with

09:10 13  him and to say to Mr. Saghir that my biggest concern was

09:10 14  that the names -- and any names and images of my child

09:10 15  and my husband would not be turned over.

09:10 16      Q.  Did you discuss anything else on that call --

09:10 17  the second call with Mr. Saghir?

09:10 18      A.  Not to my knowledge.  Not to my memory, no.

09:10 19      Q.  Did Mr. Saghir produce to you a copy of the

09:10 20  communications that he would turn over in this case?

09:10 21      A.  No, he did not.

09:10 22      Q.  Has he ever done that?

09:11 23      A.  No, he has not -- no.

09:11 24      Q.  On that second call did -- with Mr. Saghir, did

09:11 25  you discuss the substance of your communications with

14

BARKLEY
Court Reporters

09:11  1    Mr. Rapp?

09:11  2        A.  I think Mr. Saghir ensured me that -- that

09:11  3    the -- that there weren't going to be any revealing

09:11  4    personal details in the exchange.

09:11  5        Q.  On that second call with Mr. Saghir, did you

09:11  6    discuss Mr. Rapp's allegations against Mr. Fowler?

09:11  7        A.  Not to my memory, no.

09:11  8        Q.  On the second call with Mr. Saghir, did you

09:11  9    discuss any potential witnesses in Mr. Rapp's case?

09:11  10       A.  No.

09:11  11       Q.  Is there anything else you remember about that

09:11  12   second call?

09:11  13       A.  No.

09:11  14       Q.  Is that a no?

09:11  15       A.  That's a no.

09:11  16       Q.  And, Mr. Vary, I understand you haven't been

09:12  17   deposed before; but there is a court reporter taking

09:12  18   everything down; so it's -- if you're nodding or shaking

09:12  19   your head, I can see what you're saying; but we want to

09:12  20   make sure we have a clear record.  So I appreciate it if

09:12  21   we can just get an audible response for every question.

09:12  22       A.  Of course.

09:12  23       Q.  So tell us about the third communication you

09:12  24   had with Mr. Saghir.

09:12  25       A.  I -- I received the subpoena.  I can't remember

15

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 09:28 | 1 | have comment on -- on his lawsuit. |
| 09:28 | 2 | BY MR. SCOLNICK: |
| 09:28 | 3 | Q.  And what's the length of time if you -- well, |
| 09:28 | 4 | first of all, have you discussed Mr. Rapp's case with |
| 09:28 | 5 | him over the phone? |
| 09:28 | 6 | A.  No. |
| 09:28 | 7 | Q.  You've never discussed Mr. Rapp's case with him |
| 09:28 | 8 | over the phone or on FaceTime or in any way which you |
| 09:29 | 9 | could communicate by voice; is that right? |
| 09:29 | 10 | A.  Correct. |
| 09:29 | 11 | Q.  And what was the medium in which you |
| 09:29 | 12 | communicated with Mr. Rapp about his case? |
| 09:29 | 13 | MR. JASSY:  Objection.  Lacks foundation. |
| 09:29 | 14 | THE WITNESS:  Text message. |
| 09:29 | 15 | BY MR. SCOLNICK: |
| 09:29 | 16 | Q.  Do you remember approximately when that date |
| 09:29 | 17 | was that you would have text-messaged -- exchanged text |
| 09:29 | 18 | messages with Mr. Rapp about his case? |
| 09:29 | 19 | A.  It would have been whenever that -- whenever |
| 09:29 | 20 | the news of the case filing had broken.  Whatever day |
| 09:29 | 21 | that was. |
| 09:29 | 22 | Q.  Do you still have those text messages? |
| 09:29 | 23 | A.  Probably, yeah. |
| 09:30 | 24 | Q.  Have you communicated with anyone else about |
| 09:30 | 25 | Mr. Rapp's case? |

BARKLEY
Court Reporters

09:58  1    Court Reporter?  The answer was no.

09:58  2              DEPOSITION OFFICER:  Correct.

09:58  3              MR. JASSY:  Thank you.

09:58  4    BY MR. SCOLNICK:

09:58  5        Q.  Have you -- since receiving the subpoena have

09:58  6    you reviewed all of your communications between you and

09:58  7    Mr. Rapp about Mr. Fowler to determine whether there

09:58  8    were any communications that were not directly related

09:58  9    to a media article that you were going to publish or

09:59  10   research?

09:59  11       A.  No.

09:59  12       Q.  Is that a no?

09:59  13       A.  It is a no.

09:59  14       Q.  When's the last time you reviewed all of your

09:59  15   text communications with Mr. Rapp about Mr. Fowler?

09:59  16             MR. JASSY:  Objection.  Lacks foundation.

09:59  17             THE WITNESS:  I don't recall.  Probably would

09:59  18   have been around the time of the initial interview.

09:59  19   BY MR. SCOLNICK:

09:59  20       Q.  And you're talking about 2017; right?

09:59  21       A.  Right.

09:59  22       Q.  Okay.  So since receiving the subpoena you

09:59  23   haven't done that; right?

09:59  24       A.  Correct.

10:00  25       Q.  Going to Request for Production No. 2, this is

                                 51

BARKLEY
Court Reporters

10:01  1   any responsive search done for documents responsive to

10:01  2   these requests.

10:01  3        So if your instruction is to tell your client

10:01  4   not to answer any of these questions, I understand it;

10:01  5   and that's the best the record's going to get based

10:01  6   on -- on my inability to obtain more information at this

10:01  7   point.  But I just want to make sure the record is

10:01  8   clear.

10:01  9        MR. JASSY:  He can answer whether he's searched

10:01 10   for these documents.  I'm just trying to help you cut to

10:01 11   it, but that's fine.  If you want to ask him if he's

10:01 12   searched for records that reflect Request for Production

10:01 13   No. 2, that's fine.  You can ask him if he took the time

10:02 14   to search for something that we knew we weren't going to

10:02 15   produce based on the two things -- two reasons I already

10:02 16   told you.  You can ask him.

10:02 17        MR. SCOLNICK:  And that's my question, sir.

10:02 18   BY MR. SCOLNICK:

10:02 19     Q.  Mr. Vary, have you done any -- have you made

10:02 20   any attempts to search for responsive documents to

10:02 21   Request for Production 2?

10:02 22     A.  I have not.

10:02 23     Q.  And perhaps we can save some time here.

10:02 24        Have you done a search for -- in response to

10:02 25   any of these requests that were subpoenaed of you before

53

ADAM VARY - VOLUME I

BARKLEY
Court Reporters

10:07 1   reiterate the arguments that we've made here, and we'll

10:07 2   discuss further.

10:07 3           MR. JASSY:  I do too.  I do too.  That makes

10:07 4   two of us.  Yeah.

10:07 5           MR. SCOLNICK:  Well, you know what?  We've been

10:07 6   going about an hour.  You guys want to take a few

10:07 7   minutes and --

10:07 8           MR. JASSY:  Sure.

10:07 9           MR. SCOLNICK:  -- break?

10:07 10          So let's go off the record.

10:07 11          MR. JASSY:  Okay.

10:07 12          THE VIDEOGRAPHER:  We are off record at 10:07.

10:07 13              (A recess is taken.)

10:21 14          THE VIDEOGRAPHER:  We are back on record at

10:21 15   10:21.

10:21 16   BY MR. SCOLNICK:

10:21 17      Q.  Welcome back, Mr. Vary.  I -- we're going to

10:21 18   switch gears for a moment and talk to you about your

10:21 19   relationship with Mr. Rapp.  Okay?

10:21 20      A.  Okay.

10:21 21      Q.  You've known Mr. Rapp for about 20 years;

10:21 22   right?

10:21 23      A.  A little longer than that, yeah.

10:22 24      Q.  When did you meet Mr. Rapp?

10:22 25      A.  In the spring of 1999.

58

BARKLEY
Court Reporters

10:23  1    capacity as a journalist or as a friend?

10:23  2        A.  As a friend.

10:23  3        Q.  What would you guys talk about?  What types of

10:23  4    things would you communicate about?

10:23  5            MR. JASSY:  Objection.  Relevance.  I mean, he

10:23  6    can answer; but I'm not sure where this is going to go.

10:23  7            But go ahead.

10:23  8            THE WITNESS:  We would talk about movies, about

10:23  9    theater.  We would talk about gaming.

10:24 10            DEPOSITION OFFICER:  About what?

10:24 11            THE WITNESS:  Gaming, video games.

10:24 12    BY MR. SCOLNICK:

10:24 13        Q.  Anything else?

10:24 14        A.  Family.

10:24 15        Q.  Did you guys -- sorry.  I --

10:24 16        A.  What's going on in our lives.

10:24 17        Q.  So fair to say you guys became friends?

10:24 18        A.  Yes.

10:24 19        Q.  How is it that you got Mr. Rapp's contact

10:24 20    information after interviewing him?

10:24 21        A.  Gave it to me.

10:24 22        Q.  And did you give him your contact information?

10:24 23        A.  I believe so, yes.

10:24 24        Q.  We're going back pretty far in 1999, but that's

10:24 25    about the time that e-mail was becoming popular.

BARKLEY
Court Reporters

10:31  1    advice and not answering.

10:32  2    BY MR. SCOLNICK:

10:32  3        Q.  Are you still friends with Mr. Rapp?

10:32  4        A.  Would say yes.

10:32  5        Q.  So he's beyond a media source for you.  He's

10:32  6    also a friend.  Is that fair to say?

10:32  7        A.  Yes.

10:32  8        Q.  And you stayed in touch with him over the years

10:32  9    in addition to a professional relationship you have with

10:32 10    him?  What I mean by that is journalist source, you've

10:32 11    also been friends; right?

10:32 12            MR. JASSY:  Objection.  Asked and answered.

10:32 13            You can answer.

10:32 14            THE WITNESS:  Correct.

10:32 15    BY MR. SCOLNICK:

10:32 16        Q.  And we talked about some of your recent

10:32 17    communications.

10:32 18            You're aware that Mr. Rapp's birthday is in

10:32 19    October; right?

10:32 20        A.  Correct.

10:32 21        Q.  Did you go to his birthday party in New York,

10:32 22    the last --

10:32 23            MR. JASSY:  Objection.  Vague.

10:32 24    BY MR. SCOLNICK:

10:32 25        Q.  -- two months ago?

66

ADAM VARY - VOLUME I

BARKLEY
Court Reporters

11:55  1   be the pertinent details to Mr. Rapp's account in your

11:56  2   story?

11:56  3          A.  Yes.

11:56  4          Q.  Did you intentionally omit any details of

11:56  5   Mr. Rapp's account and allegations in your story?

11:56  6              MR. JASSY:  Objection.  To the extent that it

11:56  7   calls for the disclosure of unpublished material, object

11:56  8   on the basis of the reporter's privilege and the

11:56  9   reporter's shield.

11:56  10             Instruct the witness not to answer.  He may

11:56  11  answer, if he believes he can.

11:56  12             THE WITNESS:  On advice of my attorney, I'm not

11:56  13  answering that question.

11:56  14  BY MR. SCOLNICK:

11:56  15         Q.  I'm going to show you Page 31.  This is -- Page

11:56  16  31 is an exchange on October 27, 2017, starting at

11:56  17  5:01 p.m.

11:57  18             Do you see that?

11:57  19         A.  Yes, I do.

11:57  20         Q.  And your text is in gray; right?  And

11:57  21  Mr. Rapp's appears in blue --

11:57  22         A.  Correct.

11:57  23         Q.  -- right?

11:57  24             And you wrote to Mr. Rapp, "One thing to make

11:57  25  you aware of, we can't seem to place Spacey at the Tonys

119

BARKLEY
Court Reporters

11:57 1    in 2008.  He didn't present Tonys in 2008.  He didn't

11:57 2    present" -- "wasn't nominated.  And there's no photos we

11:57 3    can find.  We don't doubt he was there, but we don't

11:57 4    want to nail down a specific date that Spacey could then

11:57 5    just flatly deny."

11:57 6          Did I read that correctly?

11:57 7      A.  You did.  That's not the whole text, but...

11:57 8      Q.  No.  You're right.  It's not the whole text.

11:57 9    We can -- we can look at the whole text, if you want.

11:57 10          When is the last time you read this text

11:57 11    exchange?

11:57 12      A.  Probably when I sent it.

11:58 13          MR. SAGHIR:  Chase, what Bates is that?  What

11:58 14    Bates stamp number is that?

11:58 15          MR. SCOLNICK:  I don't think you Bates-stamped

11:58 16    it, Peter.

11:58 17          MR. SAGHIR:  Or what date is it?

11:58 18          MR. SCOLNICK:  So it's Page 31 of this PDF.

11:58 19    It's October 27, 2017, at 5:01 p.m.

11:58 20          MR. SAGHIR:  Okay.

11:58 21    BY MR. SCOLNICK:

11:58 22      Q.  So Mr. Rapp provided you a detail about the

11:58 23    last time he had seen Mr. Fowler; right?

11:58 24      A.  Yes.

11:58 25      Q.  You determined that detail was not accurate;

120

BARKLEY
Court Reporters

11:58    1    right?

11:58    2              MR. JASSY:  Objection.

11:58    3              To the extent that it calls for the disclosure

11:58    4    of unpublished information.  Instruct the witness not to

11:58    5    answer.  Otherwise, he can answer the question.

11:58    6              Objection is based on the reporter's privilege

11:58    7    and the reporter's shield.

11:58    8              THE WITNESS:  On my attorney's advice, I'm not

11:58    9    answering the question.

11:58   10    BY MR. SCOLNICK:

11:58   11        Q.  You then changed that detail before your final

11:58   12    story was published; right?

11:59   13              MR. JASSY:  You're asking about what was in the

11:59   14    published article?

11:59   15              MR. SCOLNICK:  I'm asking about what was in the

11:59   16    published article.

11:59   17              THE WITNESS:  As we published the -- I believe

11:59   18    we published it the -- the -- this was at the two

11:59   19    thousand and -- sorry -- the 1999 Tony Awards.  It would

11:59   20    have been at the 1999 Tony Awards, yes.

11:59   21    BY MR. SCOLNICK:

11:59   22        Q.  Okay.  So Mr. Rapp told you that the last time

11:59   23    he had seen Spacey was at the 2008 Tonys.  You

11:59   24    determined that Mr. Spacey did not present at the 2008

11:59   25    Tonys; right?

                                121

BARKLEY
Court Reporters

11:59 1        MR. JASSY:  Object to the extent that it calls

11:59 2    for disclosure of unpublished information, based on the

11:59 3    reporter's privilege and the reporter's shield.

11:59 4        I instruct the witness not to answer, unless he

11:59 5    feels he can.

11:59 6        THE WITNESS:  We published that Kevin Spacey

12:00 7    and Anthony Rapp were at the 1999 Tony Awards.

12:00 8    BY MR. SCOLNICK:

12:00 9      Q.  Even though Mr. Rapp initially told you that he

12:00 10   and Mr. Fowler were at the 2008 Tony Awards; correct?

12:00 11       MR. JASSY:  Objection based on the reporter's

12:00 12   privilege and the reporter's shield because it's asking

12:00 13   for unpublished information.

12:00 14       To that extent, I instruct the witness not to

12:00 15   answer, unless he's able to.

12:00 16       THE WITNESS:  By attorney's advice, I'm not

12:00 17   answering that question.

12:00 18   BY MR. SCOLNICK:

12:00 19     Q.  Were you concerned that Mr. Fowler would be

12:00 20   able to contradict some of the details of Mr. Rapp's

12:00 21   account of their interactions?

12:00 22       MR. JASSY:  Objection to the extent that it

12:00 23   calls for the disclosure of unpublished information.

12:00 24   Object on the basis of the reporter's shield and the

12:00 25   reporter's privilege.

122

BARKLEY
Court Reporters

02:09  1    BY MR. SCOLNICK:

02:09  2        Q.  Last sentence of Point 1 you said, "Rapp

02:09  3    alleges that, the best of his recollection, he has never

02:09  4    heard from nor spoken with Spacey since that night

02:09  5    besides seeing him on the set of the film of 'Six

02:09  6    Degrees of Separation' and seeing him again before the

02:09  7    1999 Tony Awards."

02:09  8            Did I read that correctly?

02:09  9        A.  You did.

02:09  10       Q.  Isn't it true that Mr. Rapp told you that he

02:09  11   last saw Mr. Fowler at the two thousand -- at the 2008

02:09  12   awards ceremony?

02:10  13           MR. JASSY:  Object on the basis -- or I object

02:10  14   to the extent that it calls for disclosure of

02:10  15   unpublished information based on the reporter's

02:10  16   privilege and the reporter's shield.

02:10  17           But to the extent that Mr. Vary believes he can

02:10  18   testify on it, he may.

02:10  19           THE WITNESS:  On the advice of my attorney, I

02:10  20   am not going to answer that question.

02:10  21   BY MR. SCOLNICK:

02:10  22       Q.  Were you concerned in this e-mail, when you

02:10  23   wrote it to Mr. Fowler's team, that you were not

02:10  24   accurately conveying what Mr. Rapp had told you?

02:10  25           MR. JASSY:  Objection.  Misstates prior

167

BARKLEY
Court Reporters

02:18    1    published; right?

02:18    2         MR. JASSY:  To the extent it calls for the

02:19    3    disclosure of unpublished information, instruct the

02:19    4    witness not to answer based on the reporter's privilege

02:19    5    and the reporter's shield.  Otherwise, he may do so.

02:19    6         THE WITNESS:  On the advice of my attorney, I'm

02:19    7    not answering that question.

02:19    8    BY MR. SCOLNICK:

02:19    9    Q.  Mr. Rapp told you before you published this

02:19   10    article that his friend from Joliet was a man named John

02:19   11    Barrowman; right?

02:19   12         MR. JASSY:  Objection.

02:19   13         To the extent it calls for the disclosure of

02:19   14    unpublished information, instruct the witness not to

02:19   15    answer on the grounds of the reporter's privilege and

02:19   16    the reporter's shield.  Otherwise, he may do so.

02:19   17         THE WITNESS:  On the advice of my attorney, I

02:19   18    am declining to answer that question.

02:20   19    BY MR. SCOLNICK:

02:20   20    Q.  Let's go back to Exhibit 103.  And turning to

02:20   21    Page 45 -- 44.  The bottom of Page 44, Mr. Rapp wrote to

02:20   22    you, "Also, I just came across an excerpt from John

02:20   23    Barrowman's book in which he talked about us both

02:20   24    meeting Kevin and going to Limelight with him."

02:20   25         Did I read that correctly?

174

BARKLEY
Court Reporters

02:22  1          MR. SAGHIR:  Speculation.

02:23  2          MR. JASSY:  Join in the objections.

02:23  3          THE WITNESS:  I wouldn't -- I would say that

02:23  4   many public figures' birthdays are likely easy to obtain

02:23  5   but not all.

02:23  6   BY MR. SCOLNICK:

02:23  7      Q.  Have you ever tried Googling Mr. Barrowman to

02:23  8   determine his birthday?

02:23  9          MR. JASSY:  Objection.

02:23 10          To the extent it calls for the disclosure of

02:23 11   unpublished information protected from disclosure by

02:23 12   the -- and news-gathering information protected from

02:23 13   disclosure by the reporter's shield and reporter's

02:23 14   privilege, I instruct the witness not to answer.

02:23 15   Otherwise, he may do so.

02:23 16          THE WITNESS:  I -- on the advice of my

02:23 17   attorney, I decline to answer.

02:23 18   BY MR. SCOLNICK:

02:23 19      Q.  Mr. Rapp, if you knew that John Barrowman was

02:23 20   actually a 19-year-old man in 1986, would you have

02:23 21   included these details claiming that he was a

02:23 22   17-year-old boy in your story?

02:23 23          MR. JASSY:  Objection.  Lacks foundation.

02:23 24   Misstates prior testimony.  Best Evidence Rule.

02:23 25          To the extent it calls for -- and

                                   177

BARKLEY
Court Reporters

02:23  1   argumentative.

02:23  2        To the extent it calls for disclosure of

02:23  3   unpublished information, instruct the witness not to

02:23  4   answer on the basis of reporter's privilege and the

02:23  5   reporter's shield.  Otherwise, he may do so.

02:24  6        THE WITNESS:  On the advice of my attorney, I

02:24  7   decline to answer.

02:24  8   BY MR. SCOLNICK:

02:24  9     Q.  Do you think it's important -- how about this.

02:24 10   Did you think in 2017 that it was important that you get

02:24 11   the age of Mr. Rapp's friend, as you referred to in the

02:24 12   story, correct before going to print?

02:24 13        MR. JASSY:  Objection.

02:24 14        To the extent it calls for the disclosure of

02:24 15   unpublished information protected from the disclosure by

02:24 16   the reporter's shield and reporter's privilege, instruct

02:24 17   the witness not to answer.  Otherwise, he may do so.

02:24 18        And I'll also object that it lacks foundation

02:24 19   and it's argumentative.

02:24 20        THE WITNESS:  On the advice of my attorney, I

02:24 21   decline to answer.

02:24 22        Can we take a quick break?

02:24 23        MR. JASSY:  We can take a break.

02:24 24        MR. SCOLNICK:  Sure.

02:24 25        THE VIDEOGRAPHER:  Okay.  We are off record at

ADAM VARY - VOLUME I

BARKLEY
Court Reporters

02:24  1   2:24.

02:24  2            (A recess is taken.)

02:34  3            THE VIDEOGRAPHER:  We are back on record at

02:34  4   2:34.

02:34  5   BY MR. SCOLNICK:

02:34  6       Q.  Mr. Vary, I can see that in one of my last

02:34  7   questions I mistakenly referred to you as Mr. Rapp.  And

02:34  8   I apologize for that.  So I'm going to ask the same

02:34  9   question.  And I understood that there was an objection,

02:34  10  but I just want to make sure the record's clear.

02:34  11           Does that sound okay?

02:34  12      A.  Yes.

02:34  13      Q.  Okay.  So, Mr. Vary, if you knew that John

02:34  14  Barrowman was actually 19 -- a 19-year-old man in 1986,

02:34  15  would you have included the details in your story that

02:35  16  he was only a 17-year-old boy?

02:35  17           MR. JASSY:  Same objections and same

02:35  18  instructions as the last question.

02:35  19           THE WITNESS:  On advice of my attorney, I am

02:35  20  declining to answer that question.

02:35  21  BY MR. SCOLNICK:

02:35  22      Q.  After publishing this story did Mr. Rapp

02:35  23  contact you and tell you that you had Mr. Barrowman's

02:35  24  age wrong and he was actually 19 at the time?

02:35  25           MR. JASSY:  Objection.

BARKLEY
Court Reporters

02:35  1          To the extent it calls for disclosure of

02:35  2  unpublished information, instruct the witness not to

02:35  3  answer on the basis of the reporter's shield and the

02:35  4  reporter's privilege.  Otherwise, he may respond.

02:35  5          THE WITNESS:  On the advice of my attorney, I'm

02:35  6  declining to answer that question.

02:35  7  BY MR. SCOLNICK:

02:35  8      Q.  Has anyone told you, after publishing this

02:35  9  article, that Mr. Barrowman was actually 19 years old in

02:35  10  1986?

02:35  11          MR. JASSY:  Objection.

02:35  12          To the extent it calls for disclosure of

02:35  13  unpublished information, instruct the witness not to

02:36  14  answer on the grounds of reporter's privilege and the

02:36  15  reporter's shield.  Otherwise, he may do so.

02:36  16          THE WITNESS:  On the advice of my attorney, I

02:36  17  am declining to answer that question.

02:36  18          MR. JASSY:  I assume you mean other than you,

02:36  19  Chase, in your representations in this deposition;

02:36  20  right?

02:36  21          MR. SCOLNICK:  Thank you.  Yes.

02:36  22  BY MR. SCOLNICK:

02:36  23      Q.  Other than me today, has anyone told you, after

02:36  24  publishing this article -- or at any time that

02:36  25  Mr. Barrowman was actually a 19-year-old man in 1986?

                                    180

BARKLEY
Court Reporters

02:36  1        MR. JASSY:  Same objection.  Same instruction.

02:36  2        THE WITNESS:  On the advice of my attorney, I'm

02:36  3  declining to answer that question.

02:36  4  BY MR. SCOLNICK:

02:36  5     Q.  If you would have known at the time of

02:36  6  publishing this article that Mr. Barrowman was a

02:36  7  19-year-old man and not a 17-year-old boy, would you

02:37  8  still have published the details as you did and included

02:37  9  in the story?

02:37 10        MR. JASSY:  Objection.  Calls for speculation.

02:37 11  Lacks foundation.

02:37 12        To the extent that it calls for the disclosure

02:37 13  of unpublished information, instruct the witness not to

02:37 14  answer.  Otherwise, he may do so.

02:37 15        THE WITNESS:  Advice of my attorney, I'm

02:37 16  declining to answer this question.

02:37 17  BY MR. SCOLNICK:

02:37 18     Q.  As a journalist, do you believe that it's

02:37 19  important to interview a percipient witness to an

02:37 20  allegation that you're writing about?

02:37 21        MR. JASSY:  Objection.  Vague.

02:37 22        But you can answer.

02:37 23        THE WITNESS:  To the best of my ability, yes,

02:37 24  it is.

02:37 25  ///

BARKLEY
Court Reporters

```
 1                 DEPOSITION OFFICER'S CERTIFICATE

 2


 3      STATE OF CALIFORNIA      }
                                 }   ss.
 4      COUNTY OF LOS ANGELES    }

 5


 6              I, THERESA JOANN PHILLIPS-BLACKWELL, hereby

 7      certify:

 8              I am a duly qualified Certified Shorthand

 9      Reporter in the State of California, holder of

10      Certificate Number CSR 12700 issued by the Court

11      Reporters Board of California and which is in full force

12      and effect.  (Fed. R Civ. P. 28(a)).

13              I am authorized to administer oaths or

14      affirmations pursuant to California Code of Civil

15      Procedure, Section 2093(b) and prior to being examined,

16      the witness was first duly sworn by me.  (Fed. R. Civ.

17      P. 28(a), 30(f)(1)).

18              I am not a relative or employee or attorney or

19      counsel of any of the parties, nor am I a relative or of

20      such attorney or counsel, nor am I financially

21      interested in this action.  (Fed. R. Civ. P. 28).

22              I am the deposition officer that

23      stenographically recorded the testimony in the foregoing

24      deposition and the foregoing transcript is a true record

25                              ///
```

280

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3              Before Completion of the deposition, review of

4    the transcript {xx} was {  } was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated: January 7, 2022

10

11

12    *Theresa Phillips-Blackwell*

13    _____

14

15

16

17

18

19

20

21

22

23

24

25

281

BARKLEY
Court Reporters