# Exhibit 8

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK


    ------------------------------x

    ANTHONY RAPP and C.D.,

              Plaintiffs,

         vs.                        Case No.:
                                    20-cv-9586 (LAK)

    KEVIN SPACEY FOWLER a/k/a
    KEVIN SPACEY,

              Defendant.
    ------------------------------x




        Remote videotaped deposition of ANTHONY RAPP

                    February 3, 2021
```

Suzanne J. Stotz, CRR, RPR, Notary Public
470403

**BARKLEY**
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
10:46  1   reviewed that document when I signed it, yes.
10:46  2         Q.    Are all of the allegations in that
10:46  3   Complaint true?
10:46  4         A.    Yes.
10:46  5         Q.    You also discussed your allegations
10:47  6   with a Mr. Vary from BuzzFeed in 2017, right?
10:47  7         A.    Yes.
10:47  8         Q.    Were you 100 percent honest with
10:47  9   Mr. Barry in that interview regarding your
10:47 10   allegations against Mr. Fowler?
10:47 11         A.    Yes.
10:47 12         Q.    Did you withhold any details from
10:47 13   Mr. Vary?
10:47 14         A.    I did not withhold any details.
10:47 15         Q.    That interview resulted in an
10:47 16   article that was published in BuzzFeed magazine
10:47 17   in October 2017, correct?
10:47 18         A.    Yes.
10:47 19         Q.    Have you reviewed that article?
10:47 20         A.    No, I have not reviewed that
10:47 21   article.  I read the article when it was
10:47 22   published.
10:47 23         Q.    That's what I meant.
10:47 24               So you read the article when it was
10:47 25   published?
```

```
10:47  1        A.    Yes.
10:47  2        Q.    Did Mr. Vary misquote you in any
10:47  3   way?
10:47  4        A.    No, he did not misquote me.
10:47  5        Q.    Did you see anything in the article
10:47  6   that was inaccurate?
10:47  7        A.    No.
10:47  8        Q.    You claim that Mr. Fowler assaulted
10:48  9   you when you were 14 years old?
10:48 10        A.    Yes.
10:48 11        Q.    How many times do you allege that
10:48 12   Mr. Fowler assaulted you?
10:48 13        A.    That time only.  That night only.
10:48 14        Q.    I want to speak to you about your
10:48 15   allegations.
10:48 16              In what year do you claim that
10:48 17   Mr. Fowler assaulted you?
10:48 18        A.    1986.
10:48 19        Q.    And you allege this happened only
10:48 20   one time, right?
10:48 21        A.    Yes.
10:48 22        Q.    In what year did you meet
10:48 23   Mr. Fowler?
10:48 24        A.    1986.
10:48 25        Q.    In what city were you living in in
```

```
16:02  1   to that, did you ever communicate directly or
16:03  2   on the topic of Mr. Fowler's response to your
16:03  3   BuzzFeed story?
16:03  4         A.    I'm sorry.  With whom?
16:03  5         Q.    With Mr. C.D.?
16:03  6         A.    Not that I recall.
16:03  7         Q.    Okay.
16:03  8               MR. SAGHIR:  Chase, just for
16:03  9         clarity, when you're talking about Kevin
16:03 10         Spacey's response, you're talking about
16:03 11         the Twitter statement that he put out,
16:03 12         correct.
16:03 13               MR. SCOLNICK:  That's right.
16:03 14               THE WITNESS:  And that's -- that's
16:03 15         what I was -- that's what I thought you
16:03 16         meant.  That's what I was answering.
16:04 17   BY MR. SCOLNICK:
16:04 18         Q.    I want to talk to you a little bit
16:04 19   more about the BuzzFeed story.
16:04 20               So you said that you read an
16:04 21   article in the New York Times from Lupita
16:04 22   Nyong'o?
16:04 23         A.    Nyong'o, yes.
16:04 24         Q.    And that was a couple of weeks
16:04 25   after the Weinstein story initially broke in
```

```
16:04  1   the New York Times?
16:04  2        A.    I don't know the timeline exactly,
16:04  3   but it was in the wake of the initial breaking
16:04  4   of the Weinstein story.  It was -- it was -- I
16:04  5   had -- it was the first -- of the Weinstein
16:04  6   story, I was aware of it.  My friends, we were
16:04  7   talking about it; but I hadn't sat down and
16:04  8   talked about it in any detail.  And her article
16:04  9   was the first one I read in detail, her
16:04 10   first-person account of what she experienced.
16:04 11        Q.    And how long after reading that
16:04 12   article did you reach out to Adam Vary?
16:04 13        A.    Immediately.
16:04 14        Q.    That same day?
16:04 15        A.    That same day.
16:05 16        Q.    Why did you reach out to Adam Vary
16:05 17   that same day?
16:05 18        A.    Because in reading her article,
16:05 19   it -- what she -- what she spoke about so
16:05 20   powerfully was her recognition of the scope of
16:05 21   what she was one piece of a line of
16:05 22   experiences.
16:05 23              That resonated very powerfully, and
16:05 24   I realized that I was one of many and that I
16:05 25   had to do the same and stand on her and the
```

```
16:05  1   other women's shoulders and do my best to stop
16:05  2   a predator from continuing to be a predator.
16:05  3        Q.    And in October 2017, why did you
16:05  4   think that you were one of many?
16:05  5        A.    Again, as I've said, the stories
16:05  6   that I've heard and other, you know, from --
16:05  7   hard to recall all the stories that I've heard
16:05  8   over the years, but a number of the stories
16:05  9   over the years.
16:05 10              MR. SAGHIR:  Chase, if you're done
16:05 11        with the screen share, can you take it
16:06 12        off?
16:06 13              MR. SCOLNICK:  Sure.
16:06 14              MR. SAGHIR:  If you're not using
16:06 15        it.
16:06 16              MR. SCOLNICK:  Of course.
16:06 17   BY MR. SCOLNICK:
16:06 18        Q.    And what exactly were you trying to
16:06 19   stop?
16:06 20        A.    Future gradation, and I was also --
16:06 21   prior to -- prior to women coming forward about
16:06 22   Bill Cosby and Harvey Weinstein, for any of us
16:06 23   who had these kinds of experiences, it never --
16:06 24   there never seemed like any recourse was ever
16:06 25   available to us.
```

262

ANTHONY RAPP



16:06  1  So all we could ever do was survive
16:06  2  it, try to warn others when we could, try to
16:06  3  share it where we could to make sure we could
16:06  4  try to do our best in what we -- you know,
16:06  5  what's been referred to by some as "the whisper
16:06  6  network" that the women in the Harvey Weinstein
16:06  7  experiences have shared.
16:06  8  When until that moment, there never
16:06  9  seemed any other avenue available to us to stop
16:06 10  people in power from being able to abuse their
16:07 11  power.
16:07 12  And when I saw what had begun to
16:07 13  happen, that there was actually the possibility
16:07 14  that there could be some accountability, I saw
16:07 15  that I could be a part of that.  And --
16:07 16       Q.    If anyone -- I'm sorry.  Go ahead.
16:07 17  Keep going.
16:07 18       A.    And at that time, the only
16:07 19  recourse, the only possible recourse was by
16:07 20  what they had done by sharing it with reporters
16:07 21  to share the information and come out publicly
16:07 22  about it to notify people.
16:07 23       Q.    Who, if anyone, did you warn before
16:07 24  2017 about Mr. Fowler?
16:07 25       A.    I didn't have any colleagues who

263

```
16:12  1   of it or not.
16:12  2        Q.    So tell me what steps you took
16:12  3   between reading the story with Ms. Nyong'o in
16:12  4   the New York Times and interviewing with
16:12  5   Mr. Vary and the -- and story being published
16:13  6   in late October?
16:13  7              MR. SAGHIR:  What do you mean --
16:13  8              MR. SCOLNICK:  I'm sorry.  What?
16:13  9              MR. SAGHIR:  Can you clarify the
16:13 10         question?
16:13 11              MR. SCOLNICK:  Sure, sure.
16:13 12   BY MR. SCOLNICK:
16:13 13        Q.    Before agreeing to do the interview
16:13 14   with -- well, first of all, you said you spoke
16:13 15   with Mr. Vary immediately after reading the
16:13 16   article, right?
16:13 17        A.    Yes.
16:13 18        Q.    And at that point, did you agree
16:13 19   that the interview would be published?
16:13 20        A.    No.
16:13 21        Q.    Did you speak with anyone before
16:13 22   agreeing to allow the media to publish your
16:13 23   account?
16:13 24        A.    Yes, I got -- yes.  I had a number
16:13 25   of conversations with my representation, with
```

269

ANTHONY RAPP

BARKLEY
Court Reporters

```
16:13  1   my partner, with my friend.  Camryn Manheim was
16:13  2   a friend that I reached out to for advice.
16:13  3   Those are the people that I recall speaking to.
16:13  4              And I -- and I spoke to -- I'm
16:13  5   sorry.  I spoke to two lawyers, one recommended
16:14  6   by my manager Elise, and one recommended by
16:14  7   Camryn.
16:14  8        Q.   Who are the two lawyers you spoke
16:14  9   with?
16:14 10        A.   I do not recall the name of the
16:14 11   lawyer that Elise, my manager, recommended.  I
16:14 12   could find the record of the -- there was an
16:14 13   email exchange, I believe, to set that
16:14 14   conversation up.  It was a conversation on the
16:14 15   phone.
16:14 16        Q.   Okay.
16:14 17        A.   And the lawyer that Camryn put me
16:14 18   in touch with was Gloria Allred.
16:14 19        Q.   Why did you want to speak with
16:14 20   these attorneys?
16:14 21        A.   I just wanted to learn what my
16:14 22   rights and protections were.  I had never done
16:14 23   anything like this before.  I just wanted to be
16:14 24   as thorough and careful as possible and
16:14 25   protected, and I was willing to take whatever
```

```
 1                C E R T I F I C A T E

 2

 3

 4            I, SUZANNE J. STOTZ, a

 5   Registered Professional Reporter, Certified

 6   Realtime Reporter, and Notary Public in and for

 7   the State of New York, do hereby certify that

 8   the foregoing is a true and accurate transcript

 9   of the stenographic above-captioned matter.

10

11                     [signature: Suzanne J. Stotz]

12         _____

13            SUZANNE J. STOTZ, RPR, CRR

14          My Commission Expires March 2, 2022

15

16

17   DATED:  February 19, 2021

18

19

20   NOTE:  THE CERTIFICATE APPENDED TO THIS

21   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

22   OF THE SAME BY ANY MEANS, UNLESS UNDER THE

23   DIRECT CONTROL AND/OR DIRECTION OF THE

24   CERTIFYING COURT REPORTER.

25
```